# EXHIBIT A

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

THE PROCTER & GAMBLE          )

COMPANY,                      )

      Plaintiff,            ) Case No. 1:08-cv-565

  vs.                         )

RNA CORPORATION,              )

      Defendant.            )


      The videoconference deposition of

JOHN HARMS, called for examination pursuant to

the Rules of Civil Procedure for the United

States District Courts pertaining to the taking

of depositions, taken before KAREN E.

DOMINICK-RIGONI, a Registered Professional

Reporter within and for the County of Cook and

State of Illinois, at 200 North LaSalle Street,

Suite 300, Illinois, on the 16th day of October,

2008, at the hour of 1:41 p.m.


Reported by:  KAREN E. DOMINICK-RIGONI, CSR, RPR

License No.:  084-004480

c633e31b-7746-444c-a965-16460d20d1e1

Page 2

1   APPEARANCES:
2   DORSEY & WHITNEY, LLT
3   MR. BRUCE EWING (via videoconference)
4   250 Park Avenue
5   New York, New York 10177
6   (212) 415-9206
7     On behalf of the Plaintiff;
8
9   BURKE, WARREN, MACKAY & SERRITELLA, P.C.
10  MR. FREDERIC A. MENDELSOHN, ESQ.
11  330 North Wabash Avenue, 22nd Floor
12  Chicago, Illinois 60611-3607
13  (312) 840-7066
14    On behalf of the Defendant;
15
16  ALSO PRESENT:
17  DORSEY & WHITNEY, LLT
18  MR. JAMES NICHOLS (via telephone)
19  50 South Sixth Street, Suite 1500
20  Minneapolis, Minnesota 55402
21  (612) 340-2600
22
23
24

Page 3

1          I N D E X
2   WITNESS              EXAMINATION
3   JOHN HARMS
4     By Mr. Ewing....................4
5
6
7
8
9        E X H I B I T S
10  NUMBER              MARKED FOR ID
11  RNA Deposition Exhibit
12    Nos. 1-5, 5A, 6-10...............4
13
14
15
16
17
18
19
20
21
22
23
24

Page 4

1          (Whereupon, RNA Deposition
2   Exhibit Nos. 1-5, 5A, 6-10 were
3   marked for identification.)
4          (Witness sworn.)
5          JOHN HARMS,
6   called as a witness herein, having been first
7   duly sworn, was examined and testified as follows:
8          EXAMINATION
9   BY MR. EWING:
10    Q.  Good afternoon, Mr. Harms.  We have met
11  both informally and remotely off the record.
12  But let me just reintroduce myself for the
13  record.  My name is Bruce Ewing.  I'm with the
14  law firm of Dorsey & Whitney, LLT, and we are
15  here representing the plaintiff, The Procter &
16  Gamble Company in this case today.
17         Sir, have you ever been deposed before?
18    A.  Yes, about five years ago.
19    Q.  And what sort of case was that?
20    A.  That was in an auto accident case.
21    Q.  Have you ever been deposed in
22  connection with a case that arose out of your
23  work?
24    A.  No, sir.

Page 5

1    Q.  Okay.  Let me give you a few
2   instructions so that we can hopefully move this
3   along.  Because I'm in New York and we are
4   conducting this deposition by videoconference,
5   it's particularly important that you wait to let
6   me finish my questions before you start your
7   answers.  I have found that on prior
8   videoconference depositions that that's
9   essential to allowing the court reporter to
10  prepare a proper transcript.  Do you understand?
11    A.  I do.
12    Q.  At the same time, I will try to avoid
13  following up with questions before you have
14  finished your answers.  If you can't hear me or
15  if you don't understand what I'm talking about,
16  would you please let me know and I will either
17  repeat the question or I'll rephrase it.  Do you
18  understand?
19    A.  I do.
20    Q.  If you want to take a break for any
21  reason at any time, I'll accommodate you so long
22  as there is not a question pending.  And
23  finally, please try to remember to give a verbal
24  response to all of my questions because the

2 (Pages 2 to 5)

c633e31b-7746-444c-a965-16460d20d1e1

Page 6

court reporter can't transcribe things like the nodding of your head or saying uh-huh in response to questions, okay?
A. Okay.
Q. Good. Sir, by whom are you employed?
A. RNA Corporation.
Q. And what is your title with RNA?
A. Director of sales and marketing.
Q. And how long have you been the director of sales and marketing?
A. A little over six years.
Q. Did you graduate from college?
A. I did.
Q. And when did you graduate from college?
A. 1968.
Q. And where did you get your degree?
A. At the University of Wisconsin.
Q. What was the first job you took after you graduated from college?
A. I think I worked in a steel mill in Milwaukee.
Q. How long were you there?
A. Oh, six months.
Q. And what was the next job you took

Page 7

after that?
A. Second Lieutenant, United States Army.
Q. And how long were you in the Army?
A. Two years active.
Q. And when you got out of the Army, what was the first job you took?
A. I believe it was life insurance, Acashia Mutual Life Insurance Company.
Q. And how long were you with Acashia?
A. A year.
Q. And what was the next job you took after that?
A. I took a job in Chicago. It was with a company called PFW. The company is a flavor and fragrance manufacturer.
Q. And how long were you with PFW?
A. 20 plus years. And I'd have to sit down and do some work on paper to give you the exact dates.
Q. That's okay. If my math is correct, you would have been there from roughly 1971 through roughly 1991?
A. Yes.
Q. Okay. What were your duties when you

Page 8

were with PFW?
A. Sales to begin with, sales management later.
Q. And what sort of products were you selling?
A. Primarily to the food industry, flavors. Toward the end, both disciplines which is the cosmetic industry and the food industry.
Q. What was the next position you took after working with PFW?
A. It was a cosmetic manufacturer by the name of Erickson Cosmetics.
Q. And how were you -- how long were you with Erickson Cosmetics?
A. This is where it starts getting tight. I would say '91 through '99.
Q. And what were your positions with Erickson Cosmetics?
A. Director of sales.
Q. And what sort of products were you selling?
A. Again, this is a contract manufacturer, skin and hair care. We manufactured for companies like Helene Curtis, Alberto Culver,

Page 9

these types of individuals.
Q. All right. And when you say that you were in charge of sales, who were you selling? Were you selling products to retailers?
A. No. We were selling manufacturing abilities. We would call on Helene Curtis and ask basically do you have overflow product that needs to be manufactured on the outside. Do you have small run products that need to be manufactured that your manufacturing scheme doesn't allow for because it's too small. There's a whole industry of people designed to do that. They do it for Procter & Gamble as well.
MR. MENDELSOHN: Excuse me one minute.
BY MR. EWING:
Q. You were with Erickson until approximately 1999 I believe you said?
A. Yes.
Q. And what was the next job you took after Erickson?
A. There was a one year -- Erickson went bankrupt. I arranged for three people to buy out the assets to create a secondary company and

Page 10

1  that company was called Chicago Cosmetics. It
2  lasted one year.
3     Q.  So until roughly 2000?
4     A.  Right.
5     Q.  And what were your duties with Chicago
6  Cosmetics?
7     A.  The same as Erickson.
8     Q.  And did Chicago Cosmetics fold in 2000?
9     A.  You mean -- yes, yes.
10    Q.  It seized to conduct business?
11    A.  It did.
12    Q.  All right. And did you take another
13 job at that time?
14    A.  That's when I went to RNA Corporation.
15    Q.  Now, was RNA a successor to Chicago
16 Cosmetics or was it completely separate?
17    MR. MENDELSOHN:  Objection to the extent
18 you're calling for a legal conclusion.
19    You have to give me time to object. Subject
20 to my objection, you can answer.
21    THE WITNESS:  Okay. Independent party.
22 BY MR. EWING:
23    Q.  Okay. Has your title remained the same
24 since you joined RNA in I take it roughly 2000?

Page 11

1     A.  Yes.
2     Q.  So you've been director of sales in
3  marketing throughout that time?
4     A.  Yes.
5     Q.  And what are your duties as RNA's
6  director of sales as to marketing?
7     A.  I have assigned accounts. I am to help
8  direct activities within RNA that have to do
9  with manufacturing and the selection of vendors
10 for manufacturing.
11    Q.  You mentioned three things, and I just
12 want to talk about each one of them briefly.
13 When you say you have assigned accounts, what
14 does that mean?
15    A.  That means I try to bring in the new
16 business. That new business becomes mine to
17 manage.
18    Q.  And when you say "new business", do you
19 mean retailers who will carry our name product?
20    MR. MENDELSOHN:  Objection. Excuse me,
21 objection to the extent the question asks --
22 assumes facts not in evidence that they are RNA
23 products.
24

Page 12

1  BY MR. EWING:
2     Q.  Go ahead. You can answer it.
3     A.  The primary business I'm looking for is
4  contract filling.
5     Q.  So similar to what you were doing when
6  you were with Erickson, correct?
7     A.  Correct.
8     Q.  All right. Then you mentioned that you
9  were directing manufacturing activities within
10 RNA?
11    A.  I'm aiding them in scheduling,
12 communication with customer as to when product
13 is desired, inventories that are necessary to
14 maintain an equal flow of product.
15    Q.  What sort of products does RNA
16 manufacture?
17    A.  Skin and hair care primarily.
18    Q.  Are there others?
19    A.  There are side issue ones, skin
20 lighters, hair straighteners, an entire line of
21 ethnic products, but the broad category is skin
22 and hair care.
23    Q.  The third item you referenced was the
24 selection of vendors and what does that involve?

Page 13

1     A.  That involved chemical suppliers,
2  manufacturers of components, corrugated, display
3  boxes, bottles, caps, that kind of product.
4     Q.  All right. Does RNA have a sales
5  force?
6     A.  No.
7     Q.  Is there anyone who reports to you?
8     A.  No.
9     Q.  What did you do to prepare for your
10 deposition today, if anything?
11    A.  I've looked again at documentation that
12 I have. Some of the information that was sent
13 from your offices to ours and we've had a brief
14 discussion earlier today as to what may
15 transpire.
16    Q.  And when you say "a brief discussion",
17 how long was that discussion?
18    A.  An hour or so.
19    Q.  Okay. And the documents that you
20 looked at, are those things that were given to
21 Counsel and produced in this case?
22    A.  Yes.
23    Q.  I'd like you to take a look at
24 Exhibit 1 that we have previously marked and you

4  (Pages 10 to 13)

c633e31b-7746-444c-a965-16460d20d1e1

Page 14

1  should have in front of you. Have you seen
2  Exhibit 1 before?
3      A.  Yes, I have.
4      Q.  And are you the person who's been
5  designated by RNA to speak to the topics that
6  are set forth in this notice?
7      A.  I am.
8      MR. MENDELSOHN:  Subject to, of course, to
9  our objections as set forth in the response to
10  plaintiff's notice of taking 30(b)(6)
11  deposition, Exhibit 2.
12     MR. EWING:  Yeah, I'd like to turn to that
13  now actually.
14  BY MR. EWING:
15     Q.  Mr. Harms, if you can take a look at
16  Exhibit 2.  Turning back to Exhibit 2,
17  Mr. Harms, have you seen this before?
18     A.  I have.
19     Q.  Okay.  Did you review this before it
20  was sent out?
21     A.  Yes.
22     Q.  And this is RNA's response to the
23  deposition notice that was marked as Exhibit 1,
24  correct?

Page 15

1      A.  Correct.
2      Q.  And there were a series of objections
3  that are contained in here to some of the
4  various topics, correct?
5      A.  Correct.
6      Q.  Okay.  Your counsel and I have had a --
7  or not I necessarily, but my firm and your
8  counsel have had an exchange of correspondence
9  about the relevance of what I'll call broadly
10  RNA's contacts with Ohio except for the products
11  at issue in this action.  And I'm not sure
12  whether we've resolved those issues or not, but
13  I am going to ask you certain questions about
14  RNA's contacts with Ohio, some that do concern
15  the products at issue and some that do not.  Are
16  you prepared today to answer questions about
17  RNA's contacts with Ohio outside of the products
18  at issue in this case?
19     MR. MENDELSOHN:  Object to the question on
20  multiple grounds, but my suggestion is that we
21  take it one question at a time because I'm going
22  to have individual objections to some questions
23  and this is a jurisdictional deposition, so I
24  presume you're going to limit your questions to

Page 16

1  jurisdictional issues and then we'll see as we
2  get to each question.
3      MR. EWING:  All right.  I'm prepared to try
4  to proceed in that way.
5      MR. MENDELSOHN:  Otherwise you're asking the
6  witness to formulate legal opinions and legal
7  conclusions and discuss strategy which is
8  privileged and improper for this witness.
9      MR. EWING:  Well, actually considering that
10  this is a Rule 30(b)(6) deposition, the witness
11  has an obligation or had an obligation to
12  prepare to answer questions about certain topics
13  that are set forth in this notice.
14     MR. MENDELSOHN:  As we --
15     MR. EWING:  My question is really a simple
16  one of whether he did or did not do that.
17     MR. MENDELSOHN:  Well, that's a different
18  question.  But subject to the objection of scope
19  framed by our response, then you could ask the
20  question -- then you can answer the question.
21  BY MR. EWING:
22     Q.  All right.  Why don't we -- why don't
23  we try this, Mr. Harms, does RNA sell its
24  products nationwide?

Page 17

1      A.  RNA sells no products under their own
2  name.
3      Q.  Okay.  But RNA manufactures products
4  and supplies those products to customers,
5  correct?
6      A.  Under their name.
7      Q.  Okay.  Does it supply products to its
8  customers on a nationwide basis?
9      MR. MENDELSOHN:  Object to the relevance.
10  Subject to that, you can answer.
11     THE WITNESS:  It's hard to answer it simply
12  because of this, I ship to distribution points.
13  How much of the country it covers, I can't tell
14  you.  I can tell you where it goes.  I can't
15  tell you where it goes from there.
16  BY MR. EWING:
17     Q.  Okay.  Into how many states does RNA
18  ship products to distribution centers?
19     MR. MENDELSOHN:  Objection, relevance.
20  Subject to my objection, you can answer.
21     THE WITNESS:  I would estimate 12, 13 states.
22  BY MR. EWING:
23     Q.  And are any of those -- is Ohio one of
24  those 12 to 13 states?

McCORKLE COURT REPORTERS, INC.
CHICAGO, ILLINOIS (312) 263-0052

c633e31b-7746-444c-a965-16460d20d1e1

Page 18

1    A.  Yes.
2    Q.  Okay.  Are there multiple customers
3  with distribution centers in Ohio or are there
4  just one?
5    A.  One.
6    Q.  And who is the one?
7    A.  ALDI Food Stores.
8    MR. MENDELSOHN:  Again, mark my continuing
9  objection to relevance to customers or -- strike
10  that, to products other than the infringing --
11  alleged infringing sales -- how about if we do
12  it that way, Bruce, so I don't have to throw in
13  an objection each time.
14    MR. EWING:  Sure.  If you want to have a
15  continuing objection to this line of
16  questioning, that's fine.
17  BY MR. EWING:
18    Q.  Where is -- does ALDI have multiple
19  distribution centers in Ohio or just one?
20    A.  Two.
21    Q.  And in what cities or towns are those
22  distribution centers located?
23    A.  Hinckley and Springfield.
24    Q.  Can you look at Exhibit 3 which is your

Page 19

1  declaration I believe.  Is it in fact the
2  declaration that you submitted in support of
3  RNA's motion to dismiss?
4    A.  It is.
5    Q.  Okay.  And then is that your signature
6  that appears on page five?
7    A.  It does.
8    Q.  Can you turn to page three of the
9  declaration and look at Paragraph 19.
10    A.  I'm looking at it.
11    Q.  Okay.  That paragraph reads "RNA's
12  total revenue from all its sales in the last
13  12 months is approximately $27,000,000."  Do you
14  see that?
15    A.  I do.
16    Q.  And is that a gross revenue
17  calculation?
18    A.  It is.
19    MR. MENDELSOHN:  Bruce, pardon me just for a
20  minute.  We filed these papers under seal is my
21  recollection.
22    MR. EWING:  I think that you did, yes.
23    MR. MENDELSOHN:  And obviously one of the
24  reasons we did that was because we're a private

Page 20

1  company and we have certain financial
2  information in here which was intended to remain
3  confidential.  I didn't pursue a protective
4  order with you in light of the expedited nature
5  of this, so I'd make a request at this point
6  that you keep this information confidential
7  between yourself and your client at a minimum.
8    MR. EWING:  Yeah.  Just so we're clear, I'm
9  fine with that and I'm certain that P & G will
10  be fine with that.  I do need to show this and
11  indeed I think it already has been shown to
12  P & G's legal department ultimately.  I don't
13  want to mislead anybody about that.
14    MR. MENDELSOHN:  Sure.
15  BY MR. EWING:
16    Q.  But let's go back to Paragraph 19.  Of
17  the 27 million in gross revenue, roughly what
18  percentage of that is accounted for by sales to
19  ALDI?
20    A.  To date this year, ALDI sales are about
21  1.1 million.
22    Q.  Could you repeat that.  I didn't hear
23  you.
24    A.  He said total.

Page 21

1    MR. MENDELSOHN:  Can you read the question
2  back again, please, because I think the witness
3  was confused.
4  BY MR. EWING:
5    Q.  Sure.  The question was of the
6  27 million in gross sales in paragraph 19,
7  approximately what percentage of that is
8  accounted for by sales as to ALDI?
9    MR. MENDELSOHN:  Why don't we read it back.
10      (Whereupon, the record was read
11      as requested.)
12    MR. MENDELSOHN:  In Ohio or ALDI -- in the
13  entirety of the country?
14  BY MR. EWING:
15    Q.  Well, let's start with ALDI in Ohio.
16    A.  $43,000.
17    Q.  And are there sales made to ALDI in
18  other places in the United States?
19    A.  Yes.
20    MR. MENDELSOHN:  Continue my relevance
21  objection to sales to other distribution centers
22  for ALDI.
23    MR. EWING:  Sure.
24

6 (Pages 18 to 21)

Page 22

1  BY MR. EWING:
2      Q.  And what are sales to non Ohio ALDI
3  locations?
4      A.  The total for the year is 1.1 million.
5      Q.  Now, is ALDI the only customer that
6  receives merchandise from RNA in Ohio?
7      A.  Yes.
8      Q.  All right.  What types of products are
9  shipped to ALDI in Ohio?
10     A.  There's two different lines:  One line
11 is a baby care line, primarily hair and skin
12 care; the second line is two items and that are
13 national brand equivalent Garnier Fructis type
14 product.
15     Q.  Where does -- withdrawn.
16         Is it correct that RNA purchases
17 components used in the manufacturing process
18 from third parties?
19     A.  Yes.
20     Q.  And would those include things like the
21 ingredients that are used to make the products
22 as well as items used to make their packaging
23 like bottles and labels?
24     A.  Yes.

Page 23

1      Q.  Does RNA purchase any of those types of
2  materials, either ingredients or bottles, labels
3  or other types of packaging from any vendors in
4  Ohio?
5      MR. MENDELSOHN:  Excuse me, let me just
6  interject an objection on relevance grounds with
7  respect to purchases from vendors.
8      Subject to that, you can answer.
9      THE WITNESS:  There's one, and the name is
10 GK Packaging.
11 BY MR. EWING:
12     Q.  And what does GK Packaging do?
13     A.  They are a manufacturer of blow molded
14 bottles and caps.
15     Q.  And does GK Packaging supply bottles
16 and caps for various items that RNA manufactures
17 or just one?
18     A.  Various.
19     Q.  And what types of items?
20     A.  Skin and hair care.
21     Q.  Is GK Packaging the only supplier of
22 bottles and caps to RNA for its skin and hair
23 care products?
24     A.  No.

Page 24

1      Q.  How many other vendors are there?
2      MR. MENDELSOHN:  Let me just throw in a
3  standing objection to other vendors that aren't
4  based in Ohio with respect to anything that RNA
5  does.
6      Subject to my objection, please answer.
7      THE WITNESS:  There are multiple -- I can
8  recollect three.  There could be as many as
9  five.
10 BY MR. EWING:
11     Q.  In terms of the amount of bottles and
12 caps that RNA purchases from these various
13 vendors, would GK Packaging be the top supplier,
14 would it be second or further down the list?
15     MR. MENDELSOHN:  Same objections as before.
16     THE WITNESS:  They would probably be second
17 or third.  I'm leaning more towards second.
18 BY MR. EWING:
19     Q.  And is GK Packaging the only supplier
20 of either ingredients or packaging components
21 that's located in Ohio?
22     A.  Yes.
23     Q.  Where in Ohio is GK Packaging located?
24     A.  Columbus, Ohio area.  It's a suburb.

Page 25

1      Q.  Has RNA done business with GK Packaging
2  for more than two years?
3      A.  Yes.
4      Q.  And has RNA done business with ALDI for
5  more than two years?
6      A.  Yes.
7      Q.  Does RNA do business with any
8  consultants who are located in Ohio?
9      A.  No.
10     Q.  Does RNA do business with any
11 distributors located in Ohio?
12     A.  No.
13     Q.  Are there any independent contractors
14 with which RNA does business that are located in
15 Ohio?
16     A.  No.
17     Q.  Have you ever traveled to Ohio on
18 business for RNA?
19     A.  I've gone to GK approximately
20 three years ago one time.
21     Q.  Why did you go visit GK three years
22 ago?
23     A.  They wanted to show me their new
24 building.

7  (Pages 22 to 25)

Page 26

1    Q.  Is there a primary contact at GK that
2  you have or that anyone else at RNA has?
3    A.  Well, yes.
4    Q.  And who is that person?
5    A.  Her name --
6    MR. MENDELSOHN: Objection, relevance.
7    Go on. I'll let you answer, but I'm
8  wondering where this goes.
9    THE WITNESS: Susan Brinkman.
10  BY MR. EWING:
11    Q.  Could you spell the last name?
12    A.  B-r-i-n-k-m-a-n.
13    Q.  Do you know whether other RNA employees
14  have gone to visit GK Packaging in the last
15  several years?
16    A.  No one.
17    Q.  Have you ever visited ALDI in Ohio?
18    A.  Never.
19    Q.  Do you know whether other RNA employees
20  have visited ALDI in Ohio?
21    A.  They have not.
22    Q.  Do you know whether other RNA employees
23  have traveled to Ohio on business at all to
24  visit anybody else in the last, let's say,

Page 27

1  two years?
2    A.  No one.
3    Q.  Are you familiar with the products that
4  are at issue in this lawsuit?
5    A.  I am.
6    Q.  In fact, if you look at Exhibit 6 which
7  is in the stack in front of you.
8    A.  Got it.
9    Q.  The -- looking only at the first page
10  of Exhibit 6, the top depicts photographs of
11  Herbal Essences shampoos, correct?
12    A.  Correct.
13    Q.  And conditioner, I should say.
14    And then the bottom depicts other types
15  of Hydrating Herbal Shampoo and Hydrating Herbal
16  Conditioner, correct?
17    A.  Correct.
18    Q.  And the product name toward the top is
19  Family Dollar, correct?
20    A.  Correct.
21    Q.  And these are products that are
22  supplied by RNA to Family Dollar, correct?
23    A.  Correct.
24    Q.  Now, the bottles in which these

Page 28

1  products are packaged, were these supplied by
2  GK Packaging?
3    A.  Yes.
4    Q.  Did GK Packaging supply all of the
5  bottles for these products that have been used
6  since they were first sold?
7    A.  Yes.
8    Q.  Did the bottles come with the labeling
9  imprinted on them or was the labeling applied
10  with paper?
11    A.  Applied.
12    Q.  And did GK Packaging supply the labels?
13    A.  No.
14    Q.  Who did?
15    A.  The label was manufactured in Chicago,
16  approved by Family Dollar and applied by RNA.
17    Q.  You mentioned before that RNA does not
18  have a sales force. How does it identify
19  customers to whom it can supply products?
20    MR. MENDELSOHN: Can we have the question
21  read back, please.
22    (Whereupon, the record was read
23    as requested.)
24    MR. MENDELSOHN: Objection to relevance.

Page 29

1  I'll let it go a little bit.
2    THE WITNESS: Okay. Many ways. We
3  understand who's in the marketplace, what
4  business they may have, a cold call is made. We
5  may get a direct phone call from said customer
6  saying I've heard of you, I'd like to do
7  business with you, I need to have this done. We
8  have vendors, sales people saying, call this man
9  at this number, he needs something done. Like I
10  said, many ways. It's just if your reputation
11  is good, your phone rings.
12  BY MR. EWING:
13    Q.  Okay. Is your web site one way in
14  which you identify potential customers?
15    A.  Unfortunately the web site is a
16  mistake. It was an attempt that is pretty much
17  neutered at this point.
18    Q.  When you say "mistake", what do you
19  mean?
20    A.  It was our first attempt. It did not
21  come across very well. We maintain the site
22  until the date we can correct the ills of the
23  web site. It is used only for informational
24  purposes. We gain no customers from it.

8 (Pages 26 to 29)

c633e31b-7746-444c-a965-16460d20d1e1

Page 30

1    Q.  When you say that you need to correct
2  the ills of the web site, what do you mean?
3    A.  It doesn't reflect what we really do.
4  I think --
5    Q.  How so?
6    A.  I think people get more confused -- we
7  get -- if I get a phone call from someone --
8  well, but I don't get phone calls.  So when I
9  view it, I look at it and says what is this
10  company selling?  And to me it sounds like he's
11  selling a line of branded products which we
12  don't do, and that's the issue I have with it,
13  and that's why I being in the marketing sales
14  side take nothing from it.
15    Q.  Okay.  A couple things, is it correct
16  based on what you just said that RNA only sells
17  store brand -- or supplies I should say, store
18  brand or private label products and not its own
19  branded product?
20    A.  Along those lines.  I think a
21  correction ought to be made in one of the
22  documents.  The one that I filled out, I think
23  it's point number six, where it says products
24  primarily for private label.  That's incorrect.

Page 31

1  The percentage of private label that we have is
2  well less than 20 percent of total.  We are a
3  cosmetic contract filler.  That's what we
4  basically do for a living.  What little chain --
5  go ahead.
6    Q.  You go ahead.
7    A.  What little chain store business we
8  have is limited to two accounts.
9    Q.  And is Family Dollar one of those
10  accounts?
11    A.  It is.
12    Q.  All right.  So I take it then that if
13  we were to divide up RNA's business by
14  percentages, it would be something less than
15  20 percent that is accounted for by supplying
16  private label or store brand products, would the
17  rest be contract manufacturing?
18    A.  Very much so.
19    Q.  And just so I'm clear about the meaning
20  of contract manufacturing as you were using it,
21  someone like Helene Curtis would call you up and
22  say we need you to supply us with this
23  particular shampoo, here's the formula, please
24  make it and package it for us?

Page 32

1    A.  That as well as individuals who are
2  starting a company who have a dream.  They want
3  to put it together.  We help them do that under
4  their label.
5    Q.  Since you've been with RNA, can you
6  recall taking calls from actual or potential
7  customers located in Ohio?
8    MR. MENDELSOHN:  I'll renew my -- let me just
9  renew my relevance objection since we've had a
10  big break with the internet.
11    Subject to that, you can answer.
12    THE WITNESS:  I'm afraid I don't recall.
13  What I recall is where I do business, I do get
14  lots of phone calls.  I don't specifically
15  recall anything from Ohio.
16  BY MR. EWING:
17    Q.  Okay.  Do you recall calling people in
18  Ohio either to solicit them or to discuss
19  business with them during your time with RNA?
20    MR. MENDELSOHN:  Same objection.
21    THE WITNESS:  There was calls made five years
22  ago to P & G.
23  BY MR. EWING:
24    Q.  And what's that?

Page 33

1    A.  Contract filling.
2    Q.  And how about more recently, any calls
3  that you can remember or e-mails perhaps that
4  you can remember in the last two years to
5  Ohio-based businesses or individuals?
6    A.  No.
7    Q.  Can you look at, Mr. Harms, Exhibit 4.
8  This is a copy of a page from the RNA web site,
9  correct?
10    A.  It is.
11    Q.  And this is the contract packaging
12  section of the site, correct?
13    A.  It is.
14    Q.  And is this an accurate copy of how the
15  site currently appears that you can tell?
16    A.  Best I can tell.
17    Q.  All right.  And at the top it indicates
18  that "RNA has created appropriate formulas for
19  use in Private Label lines sold to the retail
20  market", correct?
21    A.  Correct.
22    Q.  And it states that "formulas fall into
23  the following categories".  Do you see that?
24    A.  I do.

9 (Pages 30 to 33)

Page 34

1    Q.  And then there are four items: The
2  first is national brand equivalent formulas; the
3  second is national brand alternative formulas,
4  dollar lines; the third is hair care
5  duplications such as Pantene type, Herbal
6  Essence type, and Dove type shampoos and
7  conditioners; and then the fourth is skin care
8  duplications such as Vaseline, Aveeno,
9  Lubriderm, and Jergens type lotions.  Do you see
10 that?
11    A.  I do.
12    Q.  Is there a difference between hair care
13 duplications and national brand equivalent
14 formulas?
15    MR. MENDELSOHN:  Objection, relevance.  Could
16 you explain to me, Bruce, what this has to do
17 with jurisdiction?
18    MR. EWING:  Well, it will lead up to
19 jurisdiction with a series of questions.  I'm
20 just trying to understand this page.
21    MR. MENDELSOHN:  Subject to my objection, you
22 can answer.  I'm not sure where this goes.
23    THE WITNESS:  It's one of the examples of the
24 weakness of this web site.  Number one and

Page 35

1  number two or three is basically the same.
2  National brand equivalent is the type of
3  formulation done for what is mentioned in three.
4  BY MR. EWING:
5    Q.  Okay.  Down toward the bottom of this
6  page there's something that says quick quote
7  form.  Do you see that?
8    A.  I do.
9    Q.  AND if you look at exhibit -- if you
10 look at Exhibit 5, is this the quick quote form?
11    A.  It is.
12    Q.  And am I correct that someone can go
13 into this form and fill out the various
14 information and receive a quote from the
15 company, RNA?
16    A.  It was designed to do that, but to date
17 I have never received one of these from the
18 internet.
19    Q.  But the form is accessible to potential
20 customers in all 50 states, correct?
21    A.  It is accessible on the internet, so
22 that would be worldwide.
23    Q.  And, in fact, there's a little state
24 category on the first page.  Do you see that?

Page 36

1    A.  I do.
2    Q.  And if you click on that category, a
3  whole list of postal abbreviations for all the
4  states comes and you can insert the one of your
5  choice, correct?
6    A.  I believe so.
7    Q.  And Ohio would be one of those states?
8    A.  Yes.
9    Q.  Can you turn to the second page of
10 Exhibit 5.  There is an e-mail address listed
11 there, correct?
12    A.  Yes.
13    Q.  And is that your e-mail address?
14    A.  It is mine.
15    Q.  RNA will fill orders that are placed by
16 customers located in Ohio, correct?
17    MR. MENDELSOHN:  Are you asking him to
18 speculate on a potential customer that might
19 come in and place an order?  Is that what you're
20 asking him to do?
21    MR. EWING:  Actually I'm asking him about
22 actual customers.  There is at least one.
23    MR. MENDELSOHN:  Okay.
24    THE WITNESS:  We do.

Page 37

1  BY MR. EWING:
2    Q.  Can you look at Exhibit 5A.  This is
3  another page for -- or taken from RNA's web
4  site, correct?
5    A.  Correct.
6    Q.  And the various categories here are
7  hair care, skin care, bath products and baby
8  care, correct?
9    A.  Correct.
10    Q.  Now, the products at issue in this case
11 would fall within the category of hair care,
12 correct?
13    A.  Correct.
14    Q.  And I believe you indicated that the
15 majority of the company's products were either
16 hair care or skin care products; is that
17 correct?
18    A.  Correct.
19    Q.  Of the 27 million in sales that was
20 described in your declaration, what percentage
21 of that is accounted for by hair care products?
22    MR. MENDELSOHN:  Objection, relevance.
23 If you don't know, you shouldn't guess.
24    THE WITNESS:  I don't know.  I would be

10  (Pages 34 to 37)

Page 38

1   guessing.
2   BY MR. EWING:
3       Q.  Do you think it's more than half or
4   less than half?
5       MR. MENDELSOHN:  Same objection.
6       THE WITNESS:  It is for a number of reasons
7   and let me not dodge it or give you the feeling
8   I am.  Our largest account is an ethnic hair
9   care account.  Now, the hair care is not
10  shampoo.  It is not conditioner.  It is a
11  relaxer system to take curly hair and make it
12  long.  Technically it would all fall under this
13  category of hair care, but it is in fact nothing
14  to do.  It's a far cry from the issue you and I
15  have.  So what I need to know from you is that
16  would you like to know how much shampoo and
17  conditioner business I have or a general
18  category?
19  BY MR. EWING:
20      Q.  Why don't we do that.  How much shampoo
21  and conditioner business of the 27 million is
22  there?
23      MR. MENDELSOHN:  Same objection, relevance
24      THE WITNESS:  You'd want me to tell you over

Page 39

1   or under 50 percent?
2   BY MR. EWING:
3       Q.  Yeah.
4       A.  Well under.  Well under.
5       Q.  Well under?
6       A.  Yes.
7       Q.  Under 10 percent?
8       A.  I would say yes.
9       MR. MENDELSOHN:  If you don't know things,
10  you shouldn't guess.
11  BY MR. EWING:
12      Q.  Okay.  We were looking before at
13  photographs of the shampoo and conditioner
14  products at issue in this case.  Is
15  Family Dollar the only company or the only
16  customer I should say that purchases those
17  products from RNA?
18      A.  They are.
19      Q.  Does RNA supply products packaged in
20  similar looking bottles to other customers?
21      MR. MENDELSOHN:  Objection, relevance.  Can
22  have the question read back, too.
23          (Whereupon, the record was read
24              as requested.)

Page 40

1       MR. MENDELSOHN:  And vague.  I don't even
2   understand the question.  But what relevance
3   does your question have to jurisdiction?
4       MR. EWING:  If they're being supplied in
5   Ohio, it would be highly relevant.
6       MR. MENDELSOHN:  Okay.  But we've already
7       MR. EWING:  I don't even know whether there
8   are any.  So let's let the witness answer the
9   question.  If there aren't, we can move on.
10      THE WITNESS:  There aren't.  One location.
11  BY MR. EWING:
12      Q.  Now, where are those products that are
13  at issue in this lawsuit manufactured?
14      A.  In Chicago.
15      Q.  And we've already talked about that the
16  bottles come from GK Packaging in Ohio, correct?
17      MR. MENDELSOHN:  We have talked about it,
18  that's correct.
19      THE WITNESS:  That's correct.
20  BY MR. EWING:
21      Q.  And I believe you indicated that the
22  labels come from some place in Chicago?
23      A.  Yes, sir.
24      Q.  Where do the other ingredients or

Page 41

1   components of those products come from?
2       A.  Chemicals that make up the formulation
3   itself are from a variety of vendors most of
4   which reside in Chicago keep warehouse stocks
5   that we bring in as needed.  The only other
6   major item within this grouping is the
7   corrugated box that comes from a company called
8   Green Bay packaging which is made out of
9   Green Bay, Wisconsin.
10      Q.  Okay.  After the products are
11  manufactured by RNA, where are they shipped?
12      MR. MENDELSOHN:  You're talking about the
13  products in question in this case?
14      MR. EWING:  Yes.
15  BY MR. EWING:
16      Q.  Right now I'm just talking about the
17  products at issue in this case.
18      A.  They're shipped to the distribution
19  centers for Family Dollar.
20      Q.  And where are those distribution
21  centers?
22      A.  They're -- you can find them on their
23  web site, but there are nine distribution
24  locations none of which are in Ohio.

11  (Pages 38 to 41)

Page 42

1    Q.  Does -- go ahead.
2    A.  I was at an end.
3    Q.  Does RNA ship the products at issue in
4  this lawsuit to all nine of those distribution
5  centers?
6    A.  We do.
7    Q.  And when did RNA start shipping those
8  products to those distribution centers?
9    A.  Month of February '08.
10    Q.  Family Dollar has stores located in
11  Ohio, correct?
12    A.  I believe so.  I'm not aware of where
13  they're located.
14    Q.  Do you know how many are located in
15  Ohio?
16    A.  I have no idea.
17    MR. MENDELSOHN:  Hey, Bruce, can we take a
18  break for a couple minutes?
19    MR. EWING:  Sure.  Not a problem.
20        (Whereupon, a short break was
21        taken.)
22  BY MR. EWING:
23    Q.  Okay.  Mr. Harms, can you turn to your
24  declaration and look at page two,

Page 43

1  paragraph nine.
2    MR. MENDELSOHN:  Exhibit Number 3,
3  declaration of Harms.
4    MR. EWING:  That's correct.
5    MR. MENDELSOHN:  Page two, paragraph nine.
6    THE WITNESS:  Yes.
7  BY MR. EWING:
8    Q.  Okay.  It says here "Family Dollar, not
9  RNA, actually sells the Family Dollar Shampoo
10  and Conditioner in the allegedly infringing
11  bottles to the public", correct?
12    A.  Correct.
13    Q.  And that's a true statement, correct?
14    A.  True.
15    Q.  And the product within the bottles is
16  supplied by RNA to Family Dollar, correct?
17    A.  Correct.
18    Q.  Who came up with the idea to sell this
19  product in that packaging?
20    MR. MENDELSOHN:  Objection, relevance.  What
21  does that have to do with jurisdiction?
22    MR. EWING:  Well, it actually has to do with
23  the causing of the tortious injury.  If it was
24  RNA's idea, that's very relevant to the tortious

Page 44

1  conduct that P & G alleges occurred in Ohio.
2    MR. MENDELSOHN:  Actually, the case law says
3  that it's infringing sales that constitute the
4  tort and that's it, so your question is
5  irrelevant.
6    MR. EWING:  I don't agree with you.  I'd like
7  the witness to answer the question.
8    MR. MENDELSOHN:  I'm not going to instruct
9  him not to, but this is a jurisdictional
10  question so -- a jurisdictional deposition
11  rather.  I don't know how long I'm going to let
12  it go.
13    MR. EWING:  I understand.
14    MR. MENDELSOHN:  Can we have the question
15  read back so we can frame it.
16        (Whereupon, the record was read
17        as requested.)
18    THE WITNESS:  The first conversation was from
19  Family Dollar to me.  I was the vendor of record
20  for a number of shampoos for them.  When the
21  change came to the Herbal Essence -- P & G
22  Herbal Essence line, I believe it was '07, 2007,
23  they asked could you find me a private label
24  version, and we started.

Page 45

1  BY MR. EWING:
2    Q.  Was the bottle shape designed by RNA or
3  GK Packaging?
4    A.  GK Packaging.
5    Q.  Did RNA request that bottle shape?
6    A.  No, sir.
7    Q.  Did RNA describe to GK Packaging the
8  type of bottle shape that it wanted in any way?
9    MR. MENDELSOHN:  Let me have a continuing
10  objection to this line of inquiry.  It has no
11  relevance to jurisdictional issues here.
12    THE WITNESS:  The conversation was myself
13  calling my local rep to say are you aware of the
14  new Procter & Gamble bottle.  The answer is yes.
15  Do you have something like it.  They said we are
16  in the midst of doing it.  I said, fine, send me
17  samples when you're finished.
18  BY MR. EWING:
19    Q.  When you say your local rep, you mean a
20  representative of GK Packaging?
21    A.  Yes, sir.
22    Q.  And who was that local rep?
23    A.  At that time, his name was
24  Mike Maloney.

12  (Pages 42 to 45)

McCORKLE COURT REPORTERS, INC.
CHICAGO, ILLINOIS  (312) 263-0052

c633e31b-7746-444c-a965-16460d20d1e1

Page 46

1    Q.  And when you say local, was he someone
2  in the Chicago area or was he in GK's offices in
3  Ohio?
4    A.  He called on me in Chicago. His office
5  was in Ohio.
6    Q.  Can you look at paragraph 12 of your
7  declaration.
8    A.  I have it.
9    Q.  It says there "The bottles and labels
10  for the Family Dollar Shampoo and Conditioner
11  were designed and manufactured separately by two
12  third-parties not named as defendants in P&G's
13  Complaint." Do you see that?
14    A.  I do.
15    Q.  And I take it one of those
16  third-parties was GK Packaging?
17    A.  It was or it is.
18    Q.  And who was the other?
19    A.  Well, the current printer is a printer
20  in Chicago who makes the labels.
21    Q.  When the request was made by Family
22  Dollar for an Herbal Essences type product, did
23  you understand that Herbal Essences was a brand
24  of hair care products sold by Procter & Gamble?

Page 47

1    A.  Yes.
2    MR. MENDELSOHN: I have a standing objection
3  to this line of inquiry, and I'm debating as to
4  when to shut it down.
5  BY MR. EWING:
6    Q.  When RNA had supplied these products
7  that are at issue in this case to Family Dollar,
8  has it had discussions with Family Dollar about
9  where they would be sold?
10    A.  No, I have nothing to do with that.
11    Q.  Was there any discussion that sales
12  would not be taking place in certain states?
13    A.  None with me.
14    Q.  Do you know whether Family Dollar is
15  selling the goods at all in these stores or just
16  some of them?
17    A.  I'm only aware that I sell to all
18  D.C.s, not what stores it goes to.
19    Q.  Were you surprised when the suit was
20  filed to learn that the goods at issue in this
21  action were being sold in Ohio?
22    MR. MENDELSOHN: Objection, relevance. What
23  does his surprise or lack of surprise have to do
24  with anything on the planet Earth?

Page 48

1    MR. EWING: If the company was aware that
2  these products might be sold in Ohio, that is
3  relevant to jurisdiction.
4    MR. MENDELSOHN: He's already answered that
5  question and I disagree with the relevance, but
6  go on. Asked and answered as well.
7    Could we have the question back, please.
8        (Whereupon, the record was read
9        as requested.)
10    MR. MENDELSOHN: Objection as well. It
11  assumes facts not in evidence.
12    Subject to that, if you understand the
13  question, you can try to answer.
14    THE WITNESS: The answer was I wasn't
15  surprised because I didn't even think of it. I
16  was surprised at receiving the suit at all.
17  BY MR. EWING:
18    Q.  What is the Family Dollar distribution
19  center that's closest to Ohio?
20    A.  I don't know the mileage from where
21  they are. I am aware of the distribution center
22  in Kentucky.
23    Q.  Mr. Harms, can you take a look at
24  Exhibit 7.

Page 49

1    A.  I have it.
2    Q.  Can you tell us what this is?
3    A.  This is a cover sheet of a message from
4  Barbara Corey, buyer at Family Dollar, to a
5  broker Grosnick Marketing for me.
6    Q.  And what's Grosnick Marketing?
7    A.  They are a broker that I employ to
8  handle Family Dollar in North Carolina -- well,
9  corporate office.
10    Q.  And when you -- is Grosnick Marketing
11  then located in North Carolina?
12    A.  In Charlotte, yes.
13    Q.  And where is Family Dollar located?
14    A.  Charlotte, suburb.
15    Q.  And why is a broker involved between
16  you and Family Dollar?
17    A.  I simply use her as a conduit for
18  information. She is there on a daily basis, so
19  if there's ever issues with this customer, she
20  will hear it first, relay it on to me so I can
21  solve the issue.
22    Q.  Okay. The subject matter of this
23  e-mail is Soup Can sales. Do you see that?
24    A.  I do. Don't let that put that -- that

13  (Pages 46 to 49)

c633e31b-7746-444c-a965-16460d20d1e1

**Page 50**

1  was -- I don't know how that got on there. It's
2  a euphemism for nothing. I guess you had to put
3  something in Subject and that's what got typed.
4  But 8 is what is attached to it.
5      Q.  That's what I thought. Now, what is
6  Exhibit 8?
7      A.  I had been asked to determine what were
8  the sales of this product in Ohio. I have no
9  ability to do that other than to contact
10 Family Dollar directly, and this is my response
11 from them.
12     Q.  Okay. So if I understand you
13 correctly, you were asked to figure out what the
14 sales of the products at issue in this lawsuit
15 in Ohio were and you contacted Family Dollar for
16 that information; is that correct?
17     A.  Correct.
18     Q.  All right. And Exhibit 8 is what you
19 received from Family Dollar?
20     A.  Correct.
21     Q.  All right. And this is a printout from
22 an Excel spreadsheet, correct?
23     A.  Correct.
24     Q.  All right. And if I'm reading this

**Page 51**

1  correctly, in the left column you have the SKU
2  number, correct?
3      A.  Correct.
4      Q.  And are those Family Dollar SKU numbers
5  or RNA's SKU numbers?
6      A.  Family Dollar's.
7      Q.  All right. And then each line is
8  the -- we have the conditioner and the shampoo
9  on the two lines, correct?
10     A.  Correct.
11     Q.  All right. Then the state at issue is
12 Ohio. And then there are two columns, the first
13 one says All Time, TL Sales Unit This Year. Do
14 you see that?
15     A.  I do.
16     Q.  And are those dollar sales or unit
17 sales?
18     A.  Unit sales.
19     Q.  All right. And then the next column is
20 All Time, Total Ending Store Inventory Units
21 This Year. And what does that column reflect?
22     A.  You have sales out of the store of the
23 13,401. The 2200, 2300 I believe is what is in
24 inventory. And the one to the far, far right

**Page 52**

1  there is total.
2      Q.  All right.
3      MR. MENDELSOHN: For the record, it's 13,301
4  doing the math.
5  BY MR. EWING:
6      Q.  Now, the -- these numbers here are from
7  September 2, 2007 through August 23 of 2008,
8  correct?
9      A.  Correct.
10     Q.  Has RNA continued to supply goods to
11 Family Dollar since the end of August 2008?
12     A.  Yes.
13     Q.  So do you believe then that these
14 numbers would be -- that are reflected on
15 Exhibit 8 would be higher if we were to have an
16 updated report through the present day?
17     MR. MENDELSOHN: Objection to the extent
18 you're asking him to speculate.
19     THE WITNESS: Yes, they would be higher.
20 BY MR. EWING:
21     Q.  Do you know how much higher?
22     MR. MENDELSOHN: Same objection.
23     THE WITNESS: I wouldn't know. Without data
24 in front of you, if you wanted to just try to

**Page 53**

1  figure out where we are right now, you have to
2  understand that distribution started in the
3  second month of the year. This is going through
4  to the eighth. So you've got six -- divide the
5  total by six times -- you know, add that to the
6  back and you would have it. So I'm talking --
7  you're talking a thousand, say, 1200 bottles
8  more.
9  BY MR. EWING:
10     Q.  Can you take a look at Exhibit 9.
11     A.  I have it.
12     Q.  Mr. Harms, this is a group of
13 documents, and I just want to -- so the record's
14 clear -- let you know that I put these together
15 based on what we received from your counsel and
16 the document production in this case. This is
17 documents RNA 0003 through 24 and then RNA 0030
18 and 31 and then RNA 0038 through 49, okay? And
19 the reason these are all gathered is because
20 they all seem to relate to GK Packaging and
21 you'll tell me whether I'm correct in that
22 assumption or not. But let's just start with
23 the first page of this. Can you tell us what
24 this is?

14 (Pages 50 to 53)

Page 54

1    A.  This is a receiving report which
2  means -- it means that this is a report written
3  by RNA.  When a truckload of GK Packaging
4  material arrives, this is what is written when
5  the door is opened and it is unloaded.
6    Q.  And the date on the top this is
7  April 22, 2008?
8    A.  That is correct.
9    Q.  And it appears that there are
10  approximately 960 bottles reflected in this
11  receiving report, correct?
12    A.  No.  You should -- there's two segments
13  there.
14    Q.  Yeah.
15    A.  If you look at the first one, it says
16  FAMBT, see that line, the second line?
17    Q.  Yeah.
18    A.  That's a description of the type
19  bottle, 12-ounce hydrate conditioner.  Right
20  above that it says total, 101,760 pieces or
21  bottles.
22    Q.  I see.
23    A.  See, the second grouping is identical,
24  101,760.

Page 55

1    Q.  So if I'm reading this correctly, based
2  on what you've just said, there would be
3  approximately 203,000 bottles reflected here?
4    A.  Exactly.
5    Q.  Looking at the next page which is
6  RNA 0004, can you tell us what this is?
7    A.  That is a copy of the bill of lading.
8  That document comes from the trucker to us which
9  is started by GK Packaging.
10    Q.  All right.  And based on the date, does
11  this bill of lading pertain to the same shipment
12  that's reflected in the receiving report?
13    A.  It does.  In fact, you can see 4/21/08
14  was the date it left their location.
15    Q.  Turning on the third page which is
16  RNA 0005, can you tell us what this is?
17    A.  Oh, okay.  That is a check stub for an
18  invoice that was paid by RNA to GK Packaging for
19  the two shipments that we looked at, a total of
20  $37,768.
21    Q.  Can you look at RNA 0006?
22    A.  This is one of the invoices that was
23  paid on the previous page.
24    Q.  Looking at RNA 0007, can you tell us

Page 56

1  what this is?
2    A.  That is a handwritten purchase order
3  that started this whole thing.
4    Q.  Okay.  So is this your handwriting?
5    A.  No.
6    Q.  Whose handwriting is it?
7    A.  Deborah Linn.  Her name appears at the
8  bottom.
9    Q.  Who is she?
10    A.  She's the customer service agent for
11  Family Dollar.
12    Q.  And is she -- does she work out of
13  RNA's offices in Blue Island, Illinois?
14    A.  She does.
15    Q.  And if I'm reading this correctly, then
16  she has sent this purchase order to Susan
17  Brinker at G and P?
18    A.  GK Packaging.
19    Q.  GK Packaging?
20    A.  GK Packaging, right.
21    Q.  And it appears she's ordering several
22  hundred thousand different types of bottles,
23  correct?
24    A.  Correct.

Page 57

1    Q.  Now, are all of the bottles at issue in
2  this case reflected on this purchase order?
3    A.  No, sir.  In this stack, there should
4  be three individual sets, one for February, one
5  for May -- no, April, one for July.  This series
6  of bottles and caps was purchased three times.
7    Q.  All right.  Do you know whether this
8  purchase order form pertains to the February,
9  the April or the July orders?
10    A.  April.  See, the order was placed 3/4,
11  probably 30 days to arrive.
12    Q.  Which of the -- because it's
13  handwriting, it's a little hard to tell.  Which
14  of the items if you could point me to them on
15  this purchase order requisition form are the
16  bottles that are used with the products at issue
17  in this lawsuit?
18    A.  If you go down one, two, three, four
19  lines, the fifth line.
20    Q.  Yeah.
21    A.  No, go to the sixth line, sixth and
22  seventh line, you have the bottles where it says
23  12-ounce oval opaque blue, 12-ounce oval PET
24  clear, those are the bottles, a hundred thousand

McCORKLE COURT REPORTERS, INC.
CHICAGO, ILLINOIS (312) 263-0052

c633e31b-7746-444c-a965-16460d20d1e1

Page 58

1  of each. And the cap for that is the second
2  from the bottom line, 200,000 caps purchased.
3  Q. I see. Okay.
4  RNA 0008, could you tell us what this
5  is?
6  A. I believe it's a partner to the first
7  invoice from GK Packaging that you saw earlier
8  in the stack. That gives you your $36,000
9  payment.
10  Q. And would all of this be for the April
11  shipment?
12  A. Yes, sir.
13  Q. All right. RNA 0009, can you tell us
14  what this is?
15  A. We start over again. There's another
16  receiving report.
17  MR. MENDELSOHN: Actually that's a duplicate.
18  THE WITNESS: Yeah, this is a duplicate.
19  BY MR. EWING:
20  Q. That's what I thought. This is the --
21  A. The same one as the one on the front
22  page.
23  Q. All right.
24  A. 2253, it's the same one.

Page 59

1  Q. RNA 0010, can you tell us what this is?
2  A. That's a bill of lading document.
3  Q. This is very similar to page RNA 0004.
4  A. Yes. Look at the shipment number. It
5  says K3711.
6  Q. Yep.
7  A. On the other one it says K3710.
8  Q. Okay.
9  A. This is --
10  Q. By the way, where it says 24 skids,
11  what does that mean?
12  A. Pallets, a wooden pallet. Those are
13  individuals put on the truckload.
14  Q. Okay. RNA 0011 appears to me at least
15  to be a duplicate of RNA 0004. Would you agree
16  with me?
17  A. I do. And the next page.
18  Q. Yeah, okay.
19  And RNA 0013 is a duplicate of
20  RNA 0007, correct?
21  A. That is correct.
22  Q. All right. Now we're -- everything
23  that we've looked up at to this point, pages
24  three through 13 concerns the April shipment,

Page 60

1  correct?
2  A. It does.
3  Q. All right. And looking at the next
4  page, RNA 0014, can you tell us what this is?
5  A. This is a first part. This is an
6  invoice from GK Packaging for the very first
7  shipments placed. Invoice date, February 26.
8  Q. Now, and this is for 101,760 bottles,
9  correct?
10  A. Correct.
11  Q. I noticed before the purchase order
12  that was sent was for a hundred thousand, but
13  they sent more than a hundred thousand bottles.
14  Is that standard?
15  A. Well, we give them round numbers. What
16  they're counting is how many bottles per skid.
17  They're going to load so many pallets on a
18  truck. And a full truckload may be 22 pallets,
19  ends up being slightly more or less than what we
20  ordered.
21  Q. Okay. RNA 0015, can you tell us what
22  this is?
23  A. Yes, this is the bill of lading
24  attached to the February shipments from GK to

Page 61

1  us.
2  Q. So am I correct in looking at the
3  numbers between -- the February shipment was
4  approximately a hundred thousand bottles and the
5  April shipment was approximately 200,000
6  bottles?
7  A. That is correct, but we should probably
8  go through this stack before we make that
9  determination because there may be additional
10  shipments that came on the same truck.
11  Q. All right.
12  A. Because if you look at the receiving
13  report, 0016, you'll see two items.
14  Q. I see.
15  A. And one of the items is not the one
16  under consideration. It's the -- a Dove bottle.
17  Dove Shampoo style.
18  Q. All right, I see that. So if we're
19  looking at RNA 0016, it's only the second entry
20  on this sheet that pertains to the bottles at
21  issue in this case?
22  A. Correct. And that reflects your 101 on
23  your invoice for GK, which is 0014.
24  Q. Okay. Now, looking at RNA 0017, can

16 (Pages 58 to 61)

McCORKLE COURT REPORTERS, INC.
CHICAGO, ILLINOIS (312) 263-0052

c633e31b-7746-444c-a965-16460d20d1e1

Page 62

1  you tell us what this is?
2     A.  That's the original purchase order that
3  started this. The only thing that you should
4  look at is the top two groupings. There you see
5  the PET clear, then you see the opaque blue.
6     Q.  All right. And there are -- it looks
7  like a hundred thousand of the first bottle
8  along with a hundred thousand caps, and then
9  50,000 of the second bottle and 50,000 caps?
10    A.  Yes, sir.
11    Q.  All right. And because -- if we're
12 looking at the product code category, the BT
13 stands for bottle and the CP stands for cap?
14    A.  Yes, sir.
15    Q.  Okay. You were the person who placed
16 this order according to the form?
17    A.  I was.
18    Q.  How do you transmit these to
19 GK Packaging? By fax?
20    A.  Well, I personally send them by e-mail.
21 When they are followed up on for the secondary
22 and third orders, they are handwritten as you
23 see and faxed.
24    Q.  All right. And did you call

Page 63

1  Ms. Brinker beforehand to alert her that this
2  order was coming?
3     A.  Oh, yeah. In fact months before she
4  knew.
5     Q.  Okay. And you had -- did you ever meet
6  with her in person to discuss these bottles
7  before the order was placed?
8     A.  She's come to my office many times.
9     Q.  All right. And did she show you
10 prototypes during these meetings?
11    A.  As I remember, she didn't. They were
12 simply mailed to me.
13    Q.  And are those prototypes what the
14 bottles actually looked like when they were
15 made?
16    MR. MENDELSOHN: Objection, relevance. We're
17 back on this line of inquiry. I don't see what
18 the relevance is of it. Frankly, every time
19 I've objected to relevance, I don't think you've
20 tied it up at all. What does this have to do
21 with jurisdiction?
22    MR. EWING: Again, the causing of tortious
23 injury and where the injury occurred and the
24 foreseeability of harm in Ohio.

Page 64

1     MR. MENDELSOHN: This is not a products
2  liability case. This is an infringement case.
3  An infringement occurs at the point of sale.
4     MR. EWING: Yeah, in Ohio.
5     MR. MENDELSOHN: Subject to my objection --
6  why don't we read the question back and see if
7  we can give an answer.
8          (Whereupon, the record was read
9           as requested.)
10    THE WITNESS: Yes.
11 BY MR. EWING:
12    Q.  Could you look at page RNA 0018?
13    A.  Let me make one correction.
14    Q.  Okay.
15    A.  We're using a term that I think is
16 misplaced here. I didn't see prototypes. I saw
17 finished goods. Prototypes indicates that I
18 then have a choice of modification. I didn't.
19 I said, from your inventory, can I buy this
20 bottle. They said, here it is; yes, you can;
21 this is the price.
22    Q.  Okay. Did you look at any other
23 alternative bottles?
24    A.  There were none. I ask all of my

Page 65

1  vendors. The only ones who replied says we
2  maybe could design something in cut steel. Let
3  me know what you think. We almost never do
4  that. I don't want to own stainless steel that
5  someone could change the style and it's
6  worthless.
7     Q.  When you say you asked all of your
8  vendors, what did you ask them?
9     MR. MENDELSOHN: Objection, relevance. What
10 does this have to do with jurisdiction?
11    MR. EWING: I want to know what he meant when
12 he said he asked his vendors. I'm clarifying
13 his answer. This is legitimate follow up.
14    MR. MENDELSOHN: I don't think so.
15    Go ahead. Then let's move on.
16    THE WITNESS: The statement was do you have
17 something similar to the new Herbal Essence
18 bottle.
19 BY MR. EWING:
20    Q.  Okay. Can you look at page RNA 0018?
21    A.  Yes.
22    Q.  And can you tell us what this is?
23    A.  This is another invoice paid to
24 GK Packaging. I believe in this one, the second

17  (Pages 62 to 65)

c633e31b-7746-444c-a965-16460d20d1e1

Page 66

1  number is germane, the 18,820. I believe the
2  top payment was for something else.
3      Q. Okay. Looking at RNA 0019, can you
4  tell us what this is?
5      A. 19, invoice. Invoice dated February,
6  yes, and this is the PET shampoo bottle.
7      Q. Okay. Now, we were looking before at
8  page RNA 0014 which is an invoice dated
9  February 26 for roughly a hundred thousand of
10 one type of bottle, and this is an invoice dated
11 February 23 for a hundred thousand of a
12 different type of bottle, correct?
13     A. Well, one is the shampoo bottle, the
14 other is the conditioner bottle.
15     Q. All right. But they're both bottles at
16 issue in this case?
17     A. Correct.
18     Q. And your purchase order, RNA 0017, was
19 for 100,000 of one bottle and 50,000 of another.
20 Did it subsequently get increased, that second
21 one, to a hundred thousand?
22     A. Yes. In fact, now I remember the
23 issue. Normally shampoo sells two to one to
24 conditioner. I always buy it in those ratios.

Page 67

1  A salesperson called me back and said you know
2  you won't get your price if you only buy 50,000.
3  You'll get your price if you buy 100. I said,
4  all right, ongoing project, I'll do that. I had
5  it changed.
6      MR. MENDELSOHN: Hang on for a second,
7  please. Excuse me one minute.
8      Go on.
9  BY MR. EWING:
10     Q. Okay. Looking at page RNA 0020, can
11 you tell us what this is?
12     A. This is a bill of lading related to
13 GK Packaging to RNA concerning the opaque blue
14 bottle.
15     Q. This is still part of the February
16 shipment?
17     A. Yes, sir.
18     Q. And RNA 0021, can you tell us what that
19 is?
20     A. This is the RNA receiving report
21 related to the same delivery.
22     Q. And, again, still part of the February
23 shipment?
24     A. Yes, sir.

Page 68

1      Q. Okay. RNA 0022, can you tell us what
2  this is?
3      A. All right, 22, this is not a
4  duplication? Yes, it's a duplication of 0020.
5      Q. Okay. RNA 0023, this appears to be a
6  duplicate of RNA 0017, correct?
7      A. Correct.
8      Q. Okay. RNA 0024, can you tell us what
9  this is?
10     A. All right. The second item there is a
11 200,000 unit order for the caps that go on these
12 two bottles. The first item is related to
13 another item -- another bottle.
14     Q. All right. If we look at RNA 0030.
15     A. 30, yes.
16     Q. This is the same as 17, but also
17 reflects the increase of the 50,000 of the
18 second bottle to the 100,000 that you were just
19 describing, correct?
20     A. Yes, sir.
21     Q. And, again, we're still in the February
22 shipment here, correct?
23     A. Yes. It says second week, February
24 delivery date.

Page 69

1      Q. How soon after the bottles come in does
2  it take or did it take RNA to ship the
3  merchandise out to Family Dollar?
4      A. Speculation unless I look at records,
5  but I think it's normally about four weeks.
6      Q. Looking at RNA 0031, can you tell us
7  what this is?
8      A. Invoice, GK to RNA dated 4/16. It
9  looks like it's for caps.
10     Q. And this appears now to be back to the
11 April shipment?
12     A. It does.
13     Q. RNA 0038 is again a duplicate of
14 RNA 0017?
15     A. It is.
16     Q. Correct?
17     A. Correct.
18     Q. Okay. RNA 0039, can you tell us what
19 this is?
20     A. Well, it may in fact be another
21 February. I'm thinking that we're getting into
22 duplications again.
23     Q. Let me go back and see.
24     A. But to answer your question, it's a

18 (Pages 66 to 69)

c633e31b-7746-444c-a965-16460d20d1e1

Page 70

1  bottle order and it is for clear shampoo
2  bottles, the PET blue -- no, it's opaque, excuse
3  me, that's conditioner.
4      Q.  All right.  And if we're -- if you look
5  at RNA 0019, but for some handwriting and a
6  stamp, it appears to be the same as RNA 0039,
7  correct?
8      A.  Let me get it.  Yeah, that's a
9  duplication.
10     Q.  Okay.  If you look at RNA 0040, that
11 appears to be a duplicate again but for
12 handwriting and stamps of RNA 0014, correct?
13     A.  I agree.
14     Q.  Okay.  And then we have RNA 0041.  And
15 if you look at RNA 0008, again, but for some
16 handwriting and a couple stamps, those appear to
17 be duplicates of each other, correct?
18     A.  They do.  They are.
19     Q.  And if you look at RNA 0042, that
20 appears to be a duplicate of RNA 0006, correct?
21     A.  Correct.
22     Q.  Okay.  Then we go to RNA 0043, can you
23 tell us what this is?
24     A.  We're in July now.  This is the invoice

Page 71

1  for July shipment, GK Packaging to RNA.  It is
2  the shampoo bottle translucent, 101,000.
3      Q.  Okay.  And if you look at the next
4  page, RNA 0044, can you tell us what this is?
5      A.  This is the opaque blue which is the
6  conditioner bottle order or invoice.
7      Q.  Then if you look at RNA 0045, can you
8  tell us what this is?
9      A.  That is another invoice for a July
10 delivery.  It looks like the shampoo bottles but
11 50,000 this time.
12     Q.  And then if you look at the RNA 0046,
13 could you tell us what that is?
14     A.  It's the same but only the opaque,
15 50,000 again.
16     Q.  Okay.  So if I'm following this
17 correctly, so far for July we've got 150,000 of
18 each of the two bottles.
19     A.  For a total of 300,000 bottles.
20     Q.  And then if you look at RNA 0047, could
21 you tell us what this is?
22     A.  That reflects two items, but one of
23 them is the caps only, 200,000 of them against
24 the 300 that was ordered.

Page 72

1      Q.  All right.  And in fact if we look at
2  RNA 0048, can you tell us what this is?
3      A.  That must be a duplicate.  That flops
4  back to the April timing.
5      Q.  All right.  And then RNA 0049, can you
6  tell us what this is?
7      A.  The date is correct.  Well, it is an
8  invoice for 300,000 caps.  I wonder why.
9      Q.  Well, this one's dated -- well,
10 actually the -- I think the issue --
11     A.  Oh, the mistake here, go back to 0047.
12 That's a February order.
13     Q.  I see, okay.
14     A.  So I think that's a duplicate, unless
15 you don't have anything for caps for February.
16     Q.  Okay.  Having gone through these
17 documents, a couple questions, do you believe
18 these are all of the documents that RNA has
19 reflecting orders of the bottles at issue in
20 this case from GK Packaging?
21     A.  I do.
22     Q.  I didn't see any purchase orders or
23 receiving reports for the July shipment.  Does
24 RNA have such documents?

Page 73

1      A.  They do.  They are probably in the
2  cycle of the payment.  I get them all together
3  into one packet once the payment is made on all
4  of these.  Since this is a mid to late July,
5  this should be done because the terms are 30 to
6  45 days.
7      MR. EWING:  Okay.  Fred, to the extent there
8  are other documents like receiving reports and
9  purchase orders that are in RNA's possession, we
10 would like RNA to produce them for the July
11 shipment.
12     MR. MENDELSOHN:  Fair enough.
13 BY MR. EWING:
14     Q.  Mr. Harms, have there been any other
15 purchases of bottles from GK Packaging since
16 July?
17     A.  Of what kind?
18     Q.  Of these bottles that are in the case.
19     A.  No, sir.
20     Q.  If my math is correct, the -- there
21 were 200,000 bottles purchased in the February
22 shipment, correct?
23     A.  Correct.
24     Q.  And caps too, right?

19 (Pages 70 to 73)

Page 74

1    A.  Correct.
2    Q.  And then 200,000 bottles and caps in
3  the April shipment; is that correct?
4    A.  Right.
5    Q.  And then 300,000 bottles and caps in
6  the July shipment, correct?
7    A.  That is correct.
8    Q.  And that's a total of 700,000 bottles
9  and caps ordered from GK Packaging in Ohio that
10  are at issue in this case, correct?
11    A.  Correct.
12    Q.  Can you look at Exhibit 10?
13    A.  Yes, I have it.
14    Q.  Again, Exhibit 10 is a much smaller
15  group exhibit. RNA 0025 through 29 and then
16  RNA 0032 to 37. The company listed at the top
17  of the first page is called Almega Plastics,
18  Inc. Do you see that?
19    A.  I do.
20    Q.  Are they a supplier of bottles or other
21  materials to RNA?
22    A.  Not directly.
23    Q.  When you say "not directly", what do
24  you mean?

Page 75

1    A.  I mean this is the first time I've seen
2  this company when I got these documents. I'll
3  have to verify this with GK, but I can only
4  believe that they are a contract manufacturer
5  for GK.
6    Q.  I see.
7       So Almega would supply products to GK
8  and then GK would supply them to you?
9    A.  Well, kind of like that. GK would give
10  a contract to Almega to make certain bottles.
11  They would pass orders to them to have it
12  shipped directly from Almega to us.
13    Q.  I see.
14       Do you know whether RNA received any
15  bottles directly from Almega rather than from
16  GK?
17    A.  Well, it all comes in GK Packaging.
18  What I mean, being a contract filler for GK, for
19  all intents and purposes, it's GK material.
20  They just happen to be the blow molder, the
21  hired hand.
22    Q.  I see.
23       Have you ever dealt with Almega
24  Plastics?

Page 76

1    A.  Never heard of them.
2    Q.  Okay. Where did these documents come
3  from?
4    A.  Our files. RNA files.
5    Q.  All right. Do you know what RNA 0025
6  is?
7    A.  I can only tell you what I read. As I
8  previously said, I was not aware of this
9  document. Certainly the ones next to it I can
10  tell you that's a bill of lading, that's a
11  packing list. But have I ever seen them before,
12  did I see the truck come in, no, sir, I have
13  never done that.
14    Q.  Can you look at RNA 0027?
15    A.  I have it.
16    Q.  And can you tell us what this is?
17    A.  That is a receiving report on the
18  Family Dollar bottles and it says Almega in the
19  corner.
20    Q.  Yes.
21    A.  And the second item on there has to do
22  with what we're discussing. The first item
23  does.
24    Q.  Okay. And on the first page, are both

Page 77

1  of these items listed here the bottles at issue
2  in this case or just one group of them?
3    A.  The bottom one is the one that's
4  germane. The top one is a different product.
5    Q.  Okay. And then we have a straight bill
6  of lading. Does that -- the document RNA 0026
7  concern RNA -- the shipment identified in
8  RNA 0025?
9    A.  I can only tell you that I assume so.
10  There's not enough information on this to tell
11  me this.
12    Q.  Okay.
13    A.  The timing is right.
14    Q.  Can you look at -- I'm going to ask you
15  to go back to Exhibit 9 and turn it to page
16  RNA 0016. And can you compare -- I just want
17  you to compare 0016 to 0027.
18    A.  Does anybody have it because I'm
19  fooling around here looking for it.
20       MR. MENDELSOHN:  0016 to 0027?
21  BY MR. EWING:
22    Q.  Yes. I just want to -- if you look at
23  the two side by side.
24    A.  Yes, I see them. Question?

20  (Pages 74 to 77)

c633e31b-7746-444c-a965-16460d20d1e1

Page 78

1    Q.  Okay.  Yeah, now, these are two
2  receiving records, correct?
3    A.  They are.
4    Q.  And they are both dated the same day,
5  correct?
6    A.  They are.
7    Q.  And they both have the same purchase
8  number -- purchase order number, correct?
9    A.  Correct.
10    Q.  Well, for example, the first -- in
11  terms of SKU numbers, RNA -- actually these are
12  bottles and caps, correct?
13    MR. MENDELSOHN:  These what?
14  BY MR. EWING:
15    Q.  Well, if you look at RNA 0016, these
16  are for bottles for the SKU number 23332,
17  correct?
18    A.  Correct.
19    Q.  And then it looks like the caps are
20  RNA-CP-23332, correct?
21    A.  Almega then looks like they are the cap
22  manufacturer.
23    Q.  Okay.  So does it suggest then that
24  GK Packaging is supplying the bottles but

Page 79

1  subcontracting out the caps?
2    A.  It does.
3    Q.  Okay.  And if you look at Exhibit 10,
4  is it correct that you see references to caps as
5  opposed to bottles on all of the pages?
6    A.  Okay.  That's a cap, that's a cap, cap,
7  yes, I agree.
8    Q.  Okay.
9    A.  All of these are caps.
10    Q.  All right.  And that's referring to
11  Exhibit 10, the Almega Plastics materials?
12    A.  Yes, sir.
13    Q.  Okay.  Why don't we take a break.  I
14  just want to review my notes and then we'll see
15  if I have any further questions, okay?
16    A.  Thank you.
17    MR. EWING:  So give me about ten minutes.
18       (Whereupon, a short break was
19       taken.)
20  BY MR. EWING:
21    Q.  Back on the record.  I just have a
22  couple quick questions.
23    Mr. Harms, we looked at a fair amount
24  of documentation in Exhibit 9 concerning

Page 80

1  shipments between GK Packaging and RNA
2  concerning the products at issue in this case.
3  Is there any type of master agreement or overall
4  contract in effect currently between RNA and
5  GK Packaging or are the agreements done
6  essentially on an order-by-order basis?
7    A.  It's order by order.
8    Q.  If you go back and look at RNA
9  Exhibit 2.
10    A.  Yes.
11    Q.  This is the response to the deposition
12  notice.  If you could just look at the response
13  to exhibit -- sorry, the response to request
14  four.
15    A.  That is correct.  There is no
16  advertising budget.
17    Q.  Okay.
18    A.  There's nothing to advertise.
19    Q.  Does RNA attend any trade shows or
20  industry gatherings or conferences?
21    A.  I don't.  The owner has, I would say,
22  maybe one or two in the last five years.
23    Q.  Do you know whether those are in Ohio?
24    A.  No.  They're in Las Vegas.  The only

Page 81

1  reason he's going.
2    MR. MENDELSOHN:  This is on the record, man
3    THE WITNESS:  Oh, excuse me.
4  BY MR. EWING:
5    Q.  Does RNA place any advertisements in --
6  for any of its products in any type of
7  publications?
8    A.  Nothing other than unsolicited.  There
9  are certain listings where people will put your
10  name and address in.  We don't pay for it.
11    Q.  Okay.  And do you place those listings
12  or are those done entirely by the third party?
13    A.  They're done by a third party who then
14  tries to call you and solicit an ad.
15    Q.  Nice work if you could get it.
16    A.  Yes.
17    Q.  Are there any other types of
18  promotional activities that RNA does to get its
19  name or its reputation out there?
20    A.  Currently none.  It's all word of
21  mouth.
22    Q.  And within the past year, has it been
23  any different?
24    A.  No difference.

21  (Pages 78 to 81)

Page 82

1    MR. EWING: Okay. I did ask for certain
2  documents which I would like to get, so I'm
3  going to keep the deposition open for that
4  purpose. To the extent that there are other
5  documents that have not been turned over to us
6  that were the subject of prior correspondence,
7  we reserve our right to raise that issue with
8  the court. But subject to that and the fact
9  that we'll probably be seeing each other at some
10  point down the road again, Mr. Harms, thank you
11  for your time today and our session today is
12  over --
13    THE WITNESS: Thank you.
14    MR. EWING: -- as far as I'm concerned.
15    MR. MENDELSOHN: I have no questions if
16  that's the next step.
17    MR. EWING: All right then. I think we're
18  done.
19    MR. MENDELSOHN: We'll reserve.
20       FURTHER DEPONENT SAITH NAUGHT
21       (Witness excused at 3:45 p.m.)
22
23
24

Page 83

1
2       UNITED STATES DISTRICT COURT
3       FOR THE SOUTHERN DISTRICT OF OHIO
4              WESTERN DIVISION
5
6  THE PROCTER & GAMBLE     )
7  COMPANY,                )
8       Plaintiff,         ) Case No. 1:08-cv-565
9  vs.                     )
10  RNA CORPORATION,        )
11       Defendant.
12
13    This is to certify that I have read the
  transcript of my deposition taken in the
14  above-entitled cause by KAREN E.
  DOMINICK-RIGONI, Registered Professional
15  Reporter, on October 16, 2008, and that the
  foregoing transcript accurately states the
16  questions asked and the answers given by me as
  they now appear.
17
                _____
18              JOHN HARMS
19  SUBSCRIBED AND SWORN TO
20  Before me this _____ day
21  of _____, 2008.
22  _____
23
24  Notary Public

Page 84

1  STATE OF ILLINOIS   )
2                      ) SS:
3  COUNTY OF C O O K   )
4       I, KAREN E. DOMINICK-RIGONI, a
5  Registered Professional Reporter within and for
6  the County of Cook County and State of Illinois,
7  do hereby certify that heretofore, to-wit, on
8  the 16th day of October, 2008, personally
9  appeared before me, at 200 North LaSalle Street,
10  Suite 300, Chicago, Illinois, JOHN HARMS, in a
11  cause now pending and undetermined in the
12  Circuit Court of Cook County, Illinois, wherein
13  THE PROCTER & GAMBLE COMPANY is the Plaintiff,
14  and RNA CORPORATION is the Defendant.
15       I further certify that the said
16  witness was first duly sworn to testify the
17  truth, the whole truth and nothing but the truth
18  in the cause aforesaid; that the testimony then
19  given by said witness was reported
20  stenographically by me in the presence of the
21  said witness, and afterwards reduced to
22  typewriting by Computer-Aided Transcription, and
23  the foregoing is a true and correct transcript
24  of the testimony so given by said witness as

Page 85

1  aforesaid.
2       I further certify that the signature
3  to the foregoing deposition was not waived by
4  counsel for the respective parties.
5       I further certify that the taking of
6  this deposition was pursuant to notice, and that
7  there were present at the deposition the
8  attorneys hereinbefore mentioned.
9       I further certify that I am not
10  counsel for nor in any way related to the
11  parties to this suit, nor am I in any way
12  interested in the outcome thereof.
13       IN TESTIMONY WHEREOF: I have
14  hereunto set my hand and affixed my signature
15  this 20th day of October, 2008.
16
17
18
19
20       _____
21       KAREN E. DOMINICK-RIGONI, CSR, RPR
22       COOK COUNTY, ILLINOIS
23
24

                    22 (Pages 82 to 85)

Page 86

1       McCORKLE COURT REPORTERS, INC.
            200 North LaSalle Street, Suite 300
2              Chicago, Illinois 60601-2956
                    (312) 263-0052
3

    October 20, 2008
4
    BURKE, WARREN, MACKAY & SERRITELLA, P.C.
5   ATTN: MR. FREDERIC A. MENDELSOHN, ESQ.
    330 North Wabash Avenue, 22nd Floor
6   Chicago, Illinois 60611-3607
7       IN RE: PROCTER & GAMBLE vs. RNA
    COURT NUMBER: 1:08-cv-565
8   DATE TAKEN: 10/16/08
       DEPONENT: JOHN HARMS
9

    Dear Mr. Mendelsohn:
10
       Enclosed is the deposition transcript for the
11  aforementioned deponent in the above-entitled
    cause. Also enclosed are additional signature
12  pages, if applicable, and errata sheets.
13  Per your agreement to secure signature, please
    submit the transcript to the deponent for review
14  and signature. All changes or corrections must
    be made on the errata sheets, not on the
15  transcript itself. All errata sheets should be
    signed and all signature pages need to be signed
16  and notarized.
17  After the deponent has completed the above,
    please return all signature pages and errata
18  sheets to me at the above address, and I will
    handle distribution to the respective parties.
19
       If you have any questions, please call me at the
20  above phone number.
21  Sincerely,
22  Margaret Setina     Court Reporter:
    Signature Department  Karen E. Dominick-Rigoni
23                  CSR, RPR
24  cc: All parties.

                                           23  (Page 86)

c633e31b-7746-444c-a965-16460d20d1e1